**In re Chief Judge Robert F. ARRIGAN.**

**No. 95–143–M.P.**

Supreme Court of Rhode Island.

June 20, 1996.

---

Deming E. Sherman, Neal J. McNamara, Providence, for Plaintiff.

Richard P. McMahon, Marifrances McGinn, Providence, for Defendant.

Robert D. Kilmarx, Providence, Amicus Curiae.

## OPINION

PER CURIAM.

This case came before the Supreme Court on the petition of Robert F. Arrigan (petitioner), Chief Judge of the Workers' Compensation Court (WCC), to review the proceedings and recommendations of the Commission on Judicial Tenure and Discipline (commission) in respect to the petitioner. It is the conclusion of this Court that the commission properly found that the petitioner violated the Code of Judicial Con-

duct (code) by engaging in charitable solicitations. We further conclude that the commission erred in finding that the petitioner engaged in improper *ex parte* communications and in the improper solicitation of contributions for a professional conference. Therefore, this Court, having reviewed the record of the commission's proceedings on the law and the facts, pursuant to G.L.1956 § 8–16–6, modifies the recommendations of the commission and directs that the petitioner be publicly censured.

### Procedural History

On September 19, 1994, and January 6, 1995, the commission notified petitioner, in accordance with § 8–16–4(c), that he was being charged with the alleged violation of certain canons of the code. The commission held public hearings on January 23, 24, 25, and 26, 1995. In the *Report and Recommendation* (report) dated March 14, 1995, the commission found that petitioner had engaged in the improper solicitation of attorneys practicing before him in the WCC and had participated in improper *ex parte* communications.

The commission recommended that petitioner be suspended for a period of three months, with loss of salary and state-paid fringe benefits, and that petitioner not accrue longevity or retirement credit during his suspension. On April 3, 1995, petitioner filed a petition to review the commission's report, pursuant to § 8–16–6(b).

### I

### Improper Solicitations

"The Code of Judicial Conduct is intended to establish standards for ethical conduct of judges. It consists of broad statements called Canons [and] specific rules set forth in Sections under each Canon." Preamble, Code of Judicial Conduct. Upon completion of the hearings, the commission found that petitioner had engaged in improper solicitation of funds on behalf of various organizations with which petitioner was involved, in violation of Canons 2B, 4C(3)(b)(i), 4C(3)(b)(iv), and 4D(1)(a). The relevant portions of the respective canons read as follows:

"Canon 2. A Judge Shall Avoid Impropriety and the Appearance of Impropriety in all of the Judge's Activities. * * *

B. A judge shall not allow family, social, political or other relationships to influence the judge's judicial conduct or judgment. A judge shall not lend the prestige of judicial office to advance the private interests of the judge or others; nor shall a judge convey or permit others to convey the impression that they are in a special position to influence the judge."

"Canon 4. A Judge Shall So Conduct the Judge's Extra–Judicial Activities as to Minimize the Risk of Conflict with Judicial Obligations. * * *

C. Governmental, Civic or Charitable Activities. * * *

3. A judge may serve as an officer, director, trustee or non-legal advisor of an organization or governmental agency devoted to the improvement of the law, the legal system or the administration of justice or of an educational, religious, charitable, fraternal or civic organization not conducted for profit, subject to the following limitations and the other requirements of this Code. * * *

(b) A judge as an officer, director, trustee or non-legal advisor, or as a member or otherwise:

(i) may assist such an organization in planning fund-raising and may participate in the management and investment of the organization's funds, but shall not personally participate in the solicitation of funds or other fund-raising activities, except that a judge may solicit funds from other judges over whom the judge does not exercise supervisory or appellate authority; * * *

(iv) shall not use or permit the use of the prestige of judicial office for fund-raising or membership solicitation.

D. Financial Activities.

1. A judge shall not engage in financial and business dealings that:

(a) may reasonably be perceived to exploit the judge's judicial position."

## A. Charitable Solicitations

■ The commission found that petitioner improperly solicited funds on behalf of certain charitable organizations from attorneys who practiced in the WCC, in violation of the cited canons. Specifically, the commission found the following violations. In 1990 and 1991, petitioner improperly solicited attorneys to purchase jewelry for the benefit of the Franciscan Missionaries of Mary in New Mexico. The jewelry sales, evidenced by checks received by petitioner from attorneys, law firms, and judges, totaled $2,095. In 1990, petitioner permitted his chambers to be used for the sale of sweaters knit by a Russian immigrant nun for the benefit of an immigrant group. Two attorneys were asked by petitioner to purchase a sweater; one attorney declined and the other purchased a sweater for $175. Also, in 1990 and 1991, petitioner sold to several judges and approximately forty attorneys who practiced in the WCC over $5,000 in raffle tickets for a spring weekend in Washington, D.C., that included a memorial regatta at Georgetown University in honor of petitioner's deceased son. The commission concluded that petitioner had engaged in solicitations for charitable purposes in violation of the cited canons.

We agree that petitioner's solicitations of attorneys for charitable contributions constituted a violation of the code. We note, however, that petitioner has admitted that his actions in these fundraising activities constituted infractions of specified provisions of the code. All the improper solicitations occurred five to six years ago, and there is no evidence in the record before us that petitioner has since that time engaged in any such conduct. Rather, a review of the record has revealed that such solicitations ended approximately three years before any complaint was brought against petitioner. In addition to voluntarily ceasing these activities, petitioner has publicly recognized and apologized for the impropriety of his conduct. Moreover, the commission specifically found that these charitable solicitations were carried out without malice and without personal gain to petitioner.

■ Because petitioner admitted to, apologized for, and voluntarily ceased the improper fundraising activities, and because the solicitations did not result in personal gain to petitioner, we are of the opinion that the appropriate sanction for these violations is a public censure.

## B. EAWCBC Conference

■ The petitioner was also charged with soliciting monetary contributions from attorneys who practiced regularly in the WCC in sponsorship of a conference of the Eastern Association of Workers' Compensation Boards and Commissions (EAWCBC), an organization of which petitioner was president at the time.

The commission found no evidence that petitioner personally solicited anyone for monetary contributions. Rather, the commission found that petitioner "knew about the solicitations for EAWCBC, knew who was being solicited, and knew who contributed sponsorships." This finding was based on alleged comments to attorneys indicating that petitioner knew that the attorney or the attorney's law firm had declined to purchase sponsorships. The petitioner categorically denied knowing who had or had not contributed to the conference at the time the alleged comments were made. We are of the opinion that the testimony of two complainant lawyers, who alleged that petitioner expressed disappointment or annoyance with the lawyers or their law firms because they had not contributed sponsorships to the conference, fails to support the commission's finding of a violation of the code and falls well short of the "judicial intimidation" suggested in the commission's report.

■ Because of petitioner's position as president, Rhode Island was designated as the site of the EAWCBC conference in 1992. We take judicial notice that it is the usual practice for a host state to provide some degree of hospitality for attendees at such conferences and further note that no public funds were available for that purpose for the EAWCBC conference. The petitioner, therefore, established a committee to raise funds to underwrite in part the expenses of the conference.

One Peter Pizzarello, M.D., a member of the sponsorship committee, testified that the sponsorship activity was performed as directed, independently of petitioner. The other sponsorship-committee member responsible for fundraising, Thomas Bruzzese, Esq., testified that petitioner explicitly instructed him to isolate petitioner from solicitation activity, and Bruzzese stated categorically that he never used petitioner's name in soliciting monetary contributions for the conference. The commission in fact found that petitioner insisted that his name be removed from a proposed solicitation letter.

The code states that as an officer of an organization "devoted to the improvement of the law, the legal system or the administration of justice," a judge "may assist such an organization in planning fund-raising * * * but shall not personally participate in the solicitation of funds or other fund-raising activities." Canon 4C(3)(b)(i). Our review of the record has disclosed no evidence that petitioner personally solicited a sponsorship or authorized any individual to represent that solicitations for sponsorships were being made on petitioner's behalf. Instead, petitioner established a committee responsible for fundraising and directed that the committee act independently of him. We are of the opinion that in so doing, petitioner observed the boundaries of the code.

## II

### Ex Parte Communications

According to the commission's report, petitioner engaged, on several occasions, in *ex parte* communications in violation of Canon 3B(8). Canon 3B provides in relevant part:

"A Judge Shall Perform the Duties of Judicial Office Impartially and Diligently.

\* \* \* \* \* \*

B. Adjudicative Responsibilities.

\* \* \* \* \* \*

8. A judge shall accord to every person who has a legal interest in a proceeding, or that person's lawyer, the right to be heard according to law. A judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding."

### A. Liberty

The first of the communications cited by the commission occurred on December 1, 1992, when petitioner met in his judicial chambers with representatives of Liberty Mutual Insurance Co. (Liberty). At petitioner's request, WCC Judge George E. Healy (Healy), also attended the meeting. Healy testified that the purpose of the meeting was "to address perceived shortcomings in the manner in which [Liberty] investigated and prepared cases for submission to the court."

The meeting was requested by Liberty's business sales manager, Herbert Fuchs, who was apparently interested in exploring the possibility that Liberty would resume its participation in the workers' compensation underwriting business in Rhode Island. Liberty had ceased its workers' compensation underwriting activities in Rhode Island on December 31, 1991, but Fuchs apparently perceived the possibility that subsequent extensive reforms might have sufficiently altered the workers' compensation system to make it feasible to reenter the Rhode Island market. The topics of discussion related generally to Liberty's handling of workers' compensation cases in the past and to the requirements of the new, reformed workers' compensation laws. The petitioner and Healy identified general weaknesses in Liberty's handling of past claims, but no specific cases were discussed.

### B. Aetna

The commission also cited an April 30, 1993 meeting among petitioner, Healy, and representatives of Aetna Casualty and Surety Co. (Aetna). An April 28, 1993 letter to petitioner from Richard Broome, Aetna's counsel for law and regulatory affairs, indicated that Aetna had requested the meeting at the suggestion of Sheldon Whitehouse (Whitehouse), then director of the Department of Business Regulation, "to determine how Aetna may more efficiently process w.c. claims under the new system in Rhode Island." As had occurred at the Liberty meet-

ing, petitioner and the Aetna representatives discussed general problems in Aetna's handling of workers' compensation claims, but not specific cases.

## C. General Dynamics

General Dynamics is a defense contractor, self-insured in Rhode Island for workers' compensation matters. The commission determined that petitioner engaged in improper *ex parte* communications with a General Dynamics attorney, Peter Schavone (Schavone), and with Whitehouse, regarding certain "lump sum" settlements, or commutations, that General Dynamics intended to submit for court approval. According to the commission's report, petitioner became concerned when he learned of a marked increase in the company's submission of lump-sum settlements of workers' compensation claims. During a luncheon conversation in June 1993, petitioner discussed with Healy and another WCC judge the increase by General Dynamics in the number and settlement amounts of lump-sum commutations. They also discussed the possible implications that the commutation settlements might have in respect to the new workers' compensation system.

The commission's report states that petitioner proceeded to investigate the upward trend in the number and amount of lump-sum settlements. Following the luncheon conversation, petitioner telephoned Whitehouse and inquired whether Whitehouse knew why General Dynamics was settling so many claims and whether certain, so-called fresh-start provisions of the new workers' compensation system were implicated. Whitehouse indicated that he did not think that the lump-sum settlements would affect the fresh-start provisions.

According to the commission's report, petitioner delayed attempts by Schavone to schedule hearings for and dispose of proposed settlements. In addition, petitioner had several discussions with Schavone during which he asked Schavone about the proposed settlements and about the applicability of the fresh-start provisions. In August 1993, petitioner told Schavone that he wanted to meet in chambers with a representative of General Dynamics. Apparently, however, petitioner decided not to hold the meeting after he discovered that an attorney from the workers' compensation plaintiffs' bar might file a complaint charging petitioner with an *ex parte* meeting. Late in August 1993, petitioner met with Whitehouse, some other judges, and the insurance commissioner, after which meeting petitioner was satisfied that the fresh-start provisions were not implicated by the lump-sum commutations. Hearings were held on the proposed settlements in September 1993, and the settlements were approved thereafter.

## D. Analysis

■ The commission concluded that "the Liberty and Aetna meetings were *ex parte* meetings in violation of Canon 3B(8)," and that petitioner's communications with Whitehouse and Schavone were "clearly improper." Canon 3B(8) mandates, *inter alia,* that "[a] judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties *concerning a pending or impending proceeding.*" (Emphasis added.) The petitioner argued that the communications for which the commission faulted him were simply instances of the proper exercise of his administrative responsibilities and that they did not violate Canon 3B(8).

We are of the opinion that petitioner's communications were administrative in nature and did not constitute *ex parte* communications in violation of Canon 3B(8). Canon 3B bears the heading "Adjudicative Responsibilities," and Canon 3B(8) proscribes *ex parte* communications "concerning a pending or impending proceeding." The commission's report specifically acknowledges that petitioner's discussions with Aetna and Liberty representatives did not involve actual cases before the WCC, nor does our review of the record lead us to conclude that petitioner discussed specific settlements that were pending or impending before the WCC. In fact, the commission's report indicates that petitioner's investigation of the upward "spike" in lump-sum settlements took place "before they [referring to the proposed set-

tlements] were even filed in the clerk's office." Because none of petitioner's communications concerned "a pending or impending proceeding," we conclude that the commission erred in finding that petitioner had violated his "Adjudicative Responsibilities" by engaging in improper *ex parte* communications.[1]

In so concluding, we concur with the gravamen of petitioner's claim that the disputed communications "were integrally related to what petitioner believe[d] to be the performance of his assigned responsibilities." The petitioner introduced significant evidence that delineated his administrative responsibilities under the reformed workers' compensation system.

Former Governor Bruce Sundlun (Sundlun) described substantial problems with the workers' compensation system as "the most serious detriment to economic development" in Rhode Island at the time he became governor in January 1991. Sundlun testified that, before the system was reformed, "12 insurance companies had left the state and stopped doing business here." A commission was subsequently created, "to see what, if anything, could be done about workers' compensation in an effort to reduce its expenses." Sundlun appointed Whitehouse to be his "lead person on that commission," and Whitehouse created the commission, which included "representatives of employers, employees, union representatives, insurance company representatives, representatives of the Workers' Compensation Court, including Judge Arrigan." Eventually, the commission submitted legislation to reform the system, and the legislation was adopted by the General Assembly.

Sundlun testified that petitioner "was the principal implementer of the [new] act, and he was highly successful," so much so that Sundlun appointed petitioner chief judge of the WCC on the basis of "his record in developing the legislation and his assisting that committee in getting the legislation approved, * * * his knowledge of the system,

his knowledge of what was wrong with this system and what needed to be done to correct the system." Sundlun added that he was "immensely pleased with the way Judge Arrigan administered the law, the way he administered the court, the way he brought the calendar under control, the way * * * the whole system worked." In addition, Sundlun testified that, under petitioner's administration of the new workers' compensation system, the twelve insurance companies that had ceased writing workers' compensation policies in Rhode Island resumed writing such policies; Liberty abandoned a $13 million lawsuit against the state and in fact agreed to pay the state $5 million; insurance costs dropped dramatically; thirty-one states sent teams to Rhode Island to study the new system; and the court calendar, which had previously been backlogged by about one year, became "essentially current."

■ Counsel for petitioner made an offer of proof before the commission, stating that he expected Sundlun to testify "that the role given to [petitioner] after the court system had been reformed and with some continuing participation by Mr. Whitehouse was to persuade insurance companies who had left the state to be aware of the reform of the system and to know that the Rhode Island marketplace was a suitable and attractive place to come back and fund the system." The chair of the commission rejected the offer of proof and struck portions of Sundlun's testimony, and the commission also rejected, as irrelevant, the proffered testimony of many other witnesses who would testify in respect to the administrative responsibilities of chief judges. These witnesses included a former presiding justice of the Superior Court, the chief judge of the District Court, other judges, and a member of the commission created to reform the workers' compensation system. In light of petitioner's defense that the disputed communications were sequelae of his administrative responsibilities, we disagree with the commission's conclusion that this testimony was irrelevant, and, conse-

---

1. We note that petitioner's performance of his administrative duties was subject to the provisions of Canon 3C of the Code of Judicial Conduct entitled "Administrative Responsibilities."

Significantly, Canon 3C contains no proscription of educational meetings such as those in which petitioner took part.

quently, we hold that it was error to exclude this evidence.

As chief judge and implementer of an entirely new workers' compensation system, petitioner clearly had a unique role and responsibility in ensuring success of the reforms. The petitioner's responsibilities were administratively intensive, and we deem that the disputed communications bespeak a good-faith effort by petitioner in furtherance of his administrative responsibilities. Because we have concluded that petitioner did not engage in *ex parte* communications with any parties to pending or impending proceedings before the court, it follows that he did not violate the prohibitions of Canon 3B(8). We recognize, however, that special public scrutiny rightfully inheres in the exercise of judicial authority such as that exercised by petitioner. Accordingly, this Court advises that in similar circumstances in the future, members of the judiciary must ensure that the appearance of partiality is avoided. To this end, chief judges who carry out educational functions in conjunction with the administrative duties of their courts will best effectuate the fair and impartial administration of justice by holding such informational discussions as were held by petitioner with representatives present from all adversarial groups.

### III

### Conclusions

■ Because we are modifying the findings and recommendations of the commission, we need not reach petitioner's contention that "the recommendations are invalidly presented because two Commission participants were ineligible." We note that Rule 28 of the Rules of Judicial Tenure and Discipline requires only that "at least eight (8) members of the Commission who were present throughout the hearing find that the charges have been sustained by a preponderance of the evidence." Because eleven members of the commission were present throughout the hearings, even if two members were ineligible, a vote of the remaining nine would have satisfied the quorum requirement of the rule. Our careful review of the record, however, reveals no recorded vote of the commission members. We ac-

cept, for purposes of the instant case, the argument of counsel for the commission that the commission's vote must have been unanimous, because there was no dissenting opinion. Nevertheless, we find troubling the absence of a recorded vote of the commission members. In light of Rule 28's eight-vote requirement, we shall require recorded votes and signatures of commission members in order for us to accord meaningful review to future recommendations of the commission.

Our conclusions today are rendered in light of the sound application of the Canons of the Code of Judicial Conduct to the facts of this case. The preamble to the code nobly sets forth the premise that "[o]ur legal system is based on the principle that an independent, fair and competent judiciary will interpret and apply the laws that govern us." We have done so in this case. We have carefully evaluated the factors that this Court has determined are important reflections of a judge's conduct in the performance of work-related duties. In *In re Almeida*, 611 A.2d 1375, 1387 (R.I.1992), we set forth those factors, referring to similar considerations adopted by the New Jersey Supreme Court in *Uricoli v. Board of Trustees, Police and Firemen's Retirement System*, 91 N.J. 62, 77–78, 449 A.2d 1267, 1275–76 (1982). Having evaluated these factors, in particular that the petitioner received no personal gain as a result of the behavior complained of, we are compelled to modify the commission's recommendations. We are furthermore concerned that a suspension of any chief judge will result in rendering that judge wholly ineffective in carrying out administrative duties. Where required, of course, such suspension must be imposed. It is our considered opinion that the facts of this case do not warrant such a sanction.

In summary, we modify the recommendations of the commission. It is the conclusion of this Court that the petitioner did not engage in *ex parte* communications in violation of Canon 3B(8) or in the improper solicitation of funds in sponsorship of a professional conference. We further conclude that the petitioner's violations of the prohibitions of Canons 2B, 4C(3)(b)(i), 4C(3)(b)(iv), and 4D(1)(a) against charitable solicitations do

not warrant the commission's recommendation that the petitioner be suspended from the bench for three months. Instead, we order that the petitioner be publicly censured. The recommendations of the commission in respect to further sanctions are rejected.

FLANDERS, J., did not participate.