J-S79034-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LESLEY DIANE SHOEMAKER, | : | |
| | : | |
| Appellant | : | No. 891 MDA 2018 |

Appeal from the Judgment of Sentence May 29, 2018
in the Court of Common Pleas of Fulton County
Criminal Division at No(s): CP-29-CR-0000043-2017

BEFORE: SHOGAN, J., OLSON, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:                    **FILED MAY 16, 2019**

Lesley Diane Shoemaker ("Shoemaker") appeals from the judgment of sentence imposed following her convictions of driving under the influence of alcohol ("DUI") – general impairment, DUI – highest rate of alcohol, and careless driving.[1] We affirm in part, and vacate in part.

The trial court set forth the relevant facts as follows:

[Shoemaker] is a unionized employee of the Pennsylvania Turnpike [Commission ("the Commission")]. On December 27, 2016, Assistant Foreman Ricky Lauthers [("Lauthers")] was approached by another employee[,] who suggested that Lauthers "take a look at" [Shoemaker]. Lauthers approached [Shoemaker] just outside of the female locker room to discuss the day's assignments. During the conversation, Lauthers observed that [Shoemaker] was staggering and slurring her speech. Upon Lauthers instructing [Shoemaker] on her work assignment, [*i.e.*, to wash trucks and patrol later in the day,] [Shoemaker] stated "I know I'm not the best, but I will do my best for you." Not understanding [Shoemaker's] statement and smelling alcohol on

_____

[1] 75 Pa.C.S.A. §§ 3802(a)(1), 3802(c), 3714(a).

her breath, Lauthers further questioned [Shoemaker]. Lauthers directly asked [Shoemaker] if she was drinking[,] and [Shoemaker] denied she had anything to drink and she questioned Lauthers about whether "this was what we are going to do, really?" [Assuming that Shoemaker was going to wash trucks as assigned,] Lauthers proceeded into his office to talk with Dale Hall [("Hall")], Director of Maintenance, and inform him of Lauthers'[s] observations and suspicions. [] Hall subsequently called Patrick Caro [("Caro")], Manager of Labor Relations, and it was determined to bring [Shoemaker] into the office.

When Lauthers went to retrieve [Shoemaker] from her assigned area, he was informed that [Shoemaker] was on the Turnpike in a [] Commission pickup truck. After several attempts to reach [Shoemaker] by cell[]phone, Lauthers was able to make contact [with Shoemaker] and told her to pull over and wait for them. Lauthers and Hall proceeded west on the Turnpike towards the Fort Littleton interchange, and upon arrival[,] spotted [Shoemaker] … speaking to another motorist. As Lauthers and Hall approached, [Shoemaker] … started driving away. Hall honked his horn and shouted at [Shoemaker] to get her to stop her vehicle, at which point she made a [U]-turn, driving in the wrong direction into the opposing traffic lane, and pulled in behind their vehicle.

Lauthers and Hall told [Shoemaker] that they were taking her to the Fulton County Medical Center (FCMC) for a breath test.[2] [Shoemaker] immediately requested vacation leave, which was denied[,] and then requested sick leave, which was also denied. Lauthers and Hall told [Shoemaker] that if she refused to accompany them to FCMC, the police would be notified. [E]n route to the FCMC, after being informed again that [Shoemaker] was going to be tested for alcohol, [Shoemaker] informed Lauthers

---

[2] Relevant to this appeal, as a unionized employee, Shoemaker was subject to a Collective Bargaining Agreement ("the Agreement"), including the "Drug Testing Language Proposal between the Pennsylvania Turnpike Commission and Teamsters Local 77 & 250," which was entered into evidence at the suppression hearing. The Agreement provides for breath alcohol testing based on probable suspicion, which is defined in the Agreement as "an employee's specific observable appearance, behavior, speech or body odor that clearly indicates the need for probable suspicion alcohol testing." Commonwealth's Suppression Exhibit 1 (Agreement), at 16.

and Hall that "if that's what you're doing[,] then I'm fucked." At [] FCMC, [Shoemaker] was unable to provide a sufficient volume of breath for the breath sample during three (3) separate attempts. As a result, Hall contacted Caro, who instructed Hall to request a blood sample from [Shoemaker]. [Shoemaker] agreed to submit to a blood sample[,] and the results indicated a Blood Alcohol Content [("BAC")] of .234%. Subsequently, [Shoemaker] was instructed to leave the workplace and was removed from the work schedule pending further administrative processing.

The next day, the Pennsylvania State Police were contacted to initiate an investigation. On January 24, 2017, Trooper [Tyler] Brough [("Trooper Brough")] obtained a search warrant for the blood sample results from FCMC[, based on information he received from Lauthers and Hall,] and on January 31, 2017, [] Trooper [Brough] charged [Shoemaker] with two counts of [DUI] and careless driving.

Trial Court Opinion, 7/10/18, at 3-5 (footnote added; citations to the record omitted).

On June 8, 2017, Shoemaker filed an Omnibus Pre-Trial Motion, including, *inter alia*, a Motion to suppress her blood test results. Citing the United States Supreme Court's decision in **Birchfield v. North Dakota**,[3] Shoemaker asserted that the seizure of blood may not be compelled without consent or a warrant, and that neither the Pennsylvania nor the United States Constitutions created an exception for seizures by government employers.

_____

[3] **Birchfield v. North Dakota**, 136 S. Ct. 2160 (2016). The **Birchfield** Court held that, because the taking of a blood sample is a "search" within the meaning of the Fourth Amendment to the United States Constitution, police officers may not compel the taking of a blood sample without a search warrant, absent an applicable exception. **See id.** at 2185. Relevant to the instant appeal, the **Birchfield** Court held that implied consent laws that impose *criminal* penalties for refusing to consent to a blood test are unconstitutional, because "motorists cannot be deemed to have consented to submit to a blood test on pain of committing a criminal offense." **Id.** at 2185-86.

Shoemaker argued that the Agreement only provides for breath or urine testing. Additionally, Shoemaker claimed that she had not been informed that the test results could be used for the purpose of procuring criminal charges. The Commonwealth filed an Answer, pointing out that the holding in **Birchfield** applies to blood draws by *police* following arrests for suspicion of DUI, and that Shoemaker was subjected to a blood test by her employer. The suppression court conducted a hearing, after which it directed the parties to submit briefs on the issue.[4] On November 7, 2017, the suppression court issued an Opinion and Order denying Shoemaker's Motion.

On November 27, 2017, Shoemaker filed a Motion to Reconsider, along with her untimely brief in support of her Omnibus Pre-Trial Motion. The trial court denied Shoemaker's Motion to Reconsider the same day.

Following a bench trial, Shoemaker was found guilty of the above-mentioned offenses.[5] For her conviction of DUI – highest rate,[6] the trial court sentenced Shoemaker to a term of 6 months of intermediate punishment, the first 72 hours of which was to be served in Bedford County Jail, in addition to a $1,000 fine and other costs. For her conviction of careless driving, the trial court imposed a $25 fine and other costs. Shoemaker filed a timely Notice of

---

[4] Shoemaker did not timely comply with the trial court's directive.

[5] The parties stipulated that the blood test indicated a BAC of 0.234%. Commonwealth's Trial Exhibit 1 (Stipulation of Facts), ¶ 2. However, by stipulation, Shoemaker specifically reserved her right to challenge pre-trial rulings through post-sentence motions and on direct appeal. *Id.*, ¶ 5.

[6] Shoemaker's DUI convictions merged for sentencing purposes.

Appeal and a court-ordered Pa.R.A.P. 1925(b) Concise Statement of errors complained of on appeal.

On appeal, Shoemaker raises the following issues for our review:

1. Did the trial court err when it found that [Shoemaker's] consent to give blood under the threat of disciplinary action by a government employer should not be suppressed when the government employee was not advised that the results of the blood test could be used against her in a criminal proceeding?

2. In the absence of the blood results, was there insufficient evidence to support [Shoemaker's] conviction for DUI – general impairment in violation of Section 3802(a)(1) of the Vehicle Code?

3. Was there insufficient evidence to support [Shoemaker's] conviction for careless driving in violation of Section 3714(a) of the Vehicle Code?

Brief for Appellant at 5 (some capitalization omitted).

In her first claim, Shoemaker argues that the suppression court erred by failing to suppress the results of her blood alcohol test, because her consent was coerced by threat of non-compliance with the Agreement, and she had not been advised that the results of the blood test could be used against her in subsequent criminal proceedings. *See* Brief for Appellant at 13-26. Shoemaker offers two separate arguments in support of her claim.

First, Shoemaker claims that the warrantless blood draw was an illegal search by the Commission, which is a government entity. *See id.* at 13-25. According to Shoemaker, the fact that the government was not acting in a law enforcement capacity is irrelevant, because the Fourth Amendment's protections extend beyond the sphere of criminal investigations. *Id.* at 17.

Shoemaker cites to the United States Supreme Court's decision in *Garrity v. New Jersey*,[7] and contends that Hall's testimony at the suppression hearing indicated that he had threatened potential criminal charges arising out of the incident. *Id.* at 18-19 (citing N.T., 6/27/17, at 27 (wherein Hall testified that after Shoemaker requested vacation and sick leave, he responded, "Lesley, we are not debating this. You are going to be tested. If you don't want to go with us, we are going to call [the] State Police.")). Shoemaker also points out that the request for a police investigation was communicated to Trooper Brough the day after the incident. *Id.* at 19-20.

Shoemaker argues that she was protected by the Agreement, but that the Commission disregarded the terms of the Agreement by failing to provide Shoemaker with a union shop steward prior to requesting a breath or blood sample. *Id.* at 20-22. Shoemaker also argues that the Commission disregarded the Agreement's stated procedures regarding an individual's inability to produce a sufficient breath sample, and instead demanded a blood test. *Id.* at 22. Additionally, Shoemaker claims that because she was not

_____

[7] *Garrity v. New Jersey*, 385 U.S. 493 (1967). In *Garrity*, the Supreme Court considered state-conducted investigations of police officers for allegedly fixing traffic tickets. *Id.* at 494. Prior to being questioned, each appellant was informed that if he refused to answer, he would be subject to removal from office. *Id.* The *Garrity* Court considered the question of whether "the accused was deprived of his free choice to admit, to deny, or to refuse to answer[,]" *id.* at 496 (citation omitted), and held that "the protection of the individual of the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office…." *Id.* at 500.

individually a signatory to the Agreement, she could not consent to a method of alcohol testing that was not provided for in the Agreement. *Id.* at 22-23.

Further, Shoemaker claims that because she was informed that refusal to submit to alcohol testing would result in termination of her employment, her consent was not the result of a free and unconstrained choice. *Id.* at 24-25.

Second, Shoemaker contends that the search warrant obtained by Trooper Brough to seize the blood test results from FCMC did not cleanse the search of the illegality. *Id.* at 25-26. Shoemaker argues that, in order to be admissible, her blood test results had to be obtained by an independent source. *Id.* at 25.

We adhere to the following standard of review:

An appellate court's standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted[,] when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, the appellate court is bound by those findings and may reverse only if the court's legal conclusions are erroneous. Where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to plenary review.

*Commonwealth v. Jones*, 121 A.3d 524, 526-27 (Pa. Super. 2015) (citation,

brackets and ellipses omitted).

Here, the parties agree that Shoemaker was a unionized employee

subject to the Agreement. Brief for Appellant at 6, 20-23, 24;

Commonwealth's Brief at 4, 8. Regarding "probable suspicion" alcohol testing,

the Agreement provides, in relevant part, as follows:

**Article 35**

**Section 4. Alcohol Testing**

The parties agree that in the event of further federal legislation or [Department of Transportation ("DOT")] regulations providing for revised methodologies or requirements, those revision[s] shall, to the extent they impact this Agreement, unless mandated, be subject to mutual agreement by the parties.

* * *

B. Alcohol Testing Procedure

All alcohol testing under this section will be conducted in accordance with applicable DOT/[Federal Motor Carrier Safety Administration] regulations. All equipment used for alcohol testing must be on the [National Highway Traffic Safety Administration] Conforming Products List and be used and maintained in compliance with DOT requirements. Breath samples will be collected by a Breath Alcohol Technician (BAT) who has successfully completed the necessary training course that is the equivalent of the DOT model course and who is knowledgeable of the alcohol testing procedures set forth in 49 C[.]F[.]R[.] Part 40 and any current DOT Guidance. …

1. Screening Test

The initial screening test uses an Evidential Breath Testing (EBT) device, unless other testing methodologies or devices

- 8 -

are mandated or agreed upon, to determine levels of alcohol. …

Breath Alcohol Levels:

Less than 0.02% BAC – Negative

0.02% BAC and above – Positive (Requires Confirmation Test)

2. Confirmatory Test

All samples identified as positive in the initial screening test, indicating an alcohol concentration of 0.02% BAC or higher, shall be confirmed using an EBT device that is capable of providing a printed result in triplicate; is capable of assigning a unique number to each test; and is capable of printing out, on each copy of the printed test result, the manufacturer's name for the device, the device's serial number and the time of the test unless other testing methodologies are mandate[d] or mutually agreed upon.

* * *

H. Probable Suspicion Testing

**Employees subject to DOT probable suspicion alcohol testing under this Section shall be tested in accordance with current, applicable DOT regulations.**

For all purposes herein, the parties agree that the terms "probable suspicion" and "reasonable cause" shall be synonymous.

Probable suspicion is defined as an employee's specific observable appearance, behavior, speech or body odor that clearly indicates the need for probable suspicion alcohol testing.

…

In cases where an employee has specific, observable, abnormal indicators regarding appearance, behavior, speech or body odor, and at least one (1) supervisor, two (2) if applicable, have probable suspicion to believe that the employee is under the influence of alcohol, the Employer may require the employee, in

the presence of a union shop steward or other employee requested by the employee under observation, to submit to a breath alcohol test. Suspicion is not probable and thus not a basis for testing if it is based solely on third party observation and reports.

The supervisor(s) must make a written statement of these observations within twenty-four (24) hours. A copy must be provided to the shop steward or other union official after the **employee is discharged or suspended or taken out of service**.

* * *

J. Specimen Testing Procedures

**All procedures for alcohol testing will comply with [DOT] regulations.**

No unauthorized personnel will be allowed in any area of the testing site. Only one alcohol testing procedure will be conducted by a BAT at the same time.

…

The employee shall provide an adequate amount of breath for the [EBT] device. If the individual is unable to provide a sufficient amount of breath, the BAT shall direct the individual to again attempt to provide a complete sample.

If an employee is unsuccessful in providing the requisite amount of breath, the Employer then must have the employee obtain, within five (5) days, an evaluation from a licensed physician selected by the Employer and the Local Union and who has the expertise in the medical issues concerning the employee's inability to provide an adequate amount of breath. If the physician is unable to determine that a medical condition has, or with a high degree of probability could have, precluded the employee from providing an adequate amount of breath, **the employee's failure to provide an adequate amount of breath will be regarded as a refusal to take the test and subject the employee to discharge**.

Commonwealth's Suppression Exhibit 1 (Agreement), at 1-2, 11-13, 15-17 (emphasis added).

The portion of the Agreement concerning alcohol testing refers only to testing for employment purposes, and identifies the adverse employment actions that may result from a positive result or a refusal to submit to testing. ***See generally*** Commonwealth's Suppression Exhibit 1 (Agreement), at 15-21. The Agreement does not contemplate informing law enforcement personnel of the results for the initiation of criminal proceedings. Therefore, Shoemaker was not on notice that the results of any probable suspicion alcohol testing, provided for in the Agreement, could serve as the basis for a criminal investigation.

In addition, the Agreement[8] only provides for breath alcohol testing,[9] and in fact, the use of blood alcohol testing was unnecessary for *employment* purposes under these circumstances. The Agreement provides that "[i]f the [employee] is unable to provide a sufficient amount of breath, the BAT shall direct the [employee] to again attempt to provide a complete sample." ***Id.*** at

---

[8] We note that the "Drug Testing Language Proposal between the Pennsylvania Turnpike Commission and Teamsters Local 77 & 250" is the only portion of the Agreement contained in the certified record.

[9] The Commonwealth argues that Shoemaker consented to the use of blood testing, pointing to language in the Agreement that provides for breath testing "unless other testing methodologies or devices are mandated or agreed upon." Commonwealth's Brief at 8 (citing Commonwealth's Suppression Exhibit 1 (Agreement), at 12, 13). However, the signatories to the Agreement are the Teamsters Local Unions 77 and 250, and the Commission. Thus, it is not clear that Shoemaker, as an individual, had the authority or ability to consent to an alternate testing method.

17. If the employee is still unable to provide a sufficient amount of breath, the Employer must direct the employee to obtain an evaluation from a licensed physician within five days. *Id.* If the physician cannot determine that a medical condition could have prevented the employee from providing a sufficient amount of breath, "the employee's failure to provide an adequate amount of breath will be regarded as a refusal to take the test and subject the employee to discharge." *Id.* Thus, a refusal or inability to provide an adequate amount of breath (assuming a physician has not identified a relevant medical condition) results in the same disciplinary action as a positive test result at or above the applicable state DUI limit. *Id.*; *see also id.* at 17-18 (providing that an employee's first positive test result at or above the state DUI limit subjects that employee to discharge).

Further, the Agreement specifically dictates that "[e]mployees subject to DOT probable suspicion alcohol testing … shall be tested in accordance with current, applicable DOT regulations." *Id.* at 15; *see id.* at 16 (indicating that alcohol testing procedures must comply with DOT regulations). This language—in addition to the numerous references to DOT regulations throughout the Agreement—indicates an intention between the parties to incorporate the provisions of 49 C.F.R., Part 40 (Procedures for Transportation Workplace Drug and Alcohol Testing Programs). The DOT regulations provide that "other types of alcohol tests (*e.g.*, blood and urine) are not authorized for testing …. **Only saliva or breath for screening tests and breath for confirmation tests using approved devices are permitted**." 49 C.F.R.

§ 40.277 (emphasis added). The Agreement is silent regarding the confidentiality of alcohol test results, with the exception of a brief directive that "[t]he Employer shall maintain records in a secure manner so that disclosure of information to unauthorized persons does not occur." Commonwealth's Suppression Exhibit 1 (Agreement), at 20. However, under DOT regulations, employers are generally prohibited from releasing an employee's test results to third parties without the employee's specific written consent. 49 C.F.R. § 40.321. The regulations also provide as follows, concerning the release of information in legal proceedings:

> **§ 40.323 May program participants release drug or alcohol test information in connection with legal proceedings?**
>
> (a) As an employer, you may release information pertaining to an employee's drug or alcohol test without the employee's consent in certain legal proceedings.
>
> * * *
>
> (2) These proceedings also include a criminal or civil action resulting from an employee's performance of safety-sensitive duties, **in which a court of competent jurisdiction determines that the drug and alcohol test information sought is relevant to the case and issues an order directing the employer to produce the information.** … The employer is authorized to respond to the court's order to produce the records.
>
> (b) In such a proceeding, **you may release the information to the decisionmaker in the proceeding** …. You may release the information only with a binding stipulation that the decisionmaker to whom it is released will make it available only to the parties to the proceeding.

*Id.* § 40.323 (emphasis added).

Here, Shoemaker failed to supply an adequate amount of breath to complete a breath alcohol test. Under the Agreement, the Commission should have directed Shoemaker to obtain an evaluation by a licensed physician within five days, at which time, assuming no medical conditions were identified, her inability to perform the test would be considered a refusal and result in her discharge. *See* Commonwealth's Suppression Exhibit 1 (Agreement), at 17; *see also* 49 C.F.R. § 40.265 (setting forth a similar procedure under the DOT regulations). Instead, Commission employees asked Shoemaker to consent to a blood alcohol test, a method that is not authorized by the Agreement, and which is specifically prohibited by DOT regulations. Therefore, the Commission's decision to proceed with a blood alcohol test was improper under the Agreement.

Additionally, the Commission contacted the police the following day to initiate a criminal investigation into the incident. After receiving this information, Trooper Brough spoke with Caro, who told him that Shoemaker had been drunk at work, and had been driving a Commission vehicle while intoxicated. *See* N.T. (Trial, Amended), 5/9/18, at 28; *see also* Affidavit of Probable Cause, 1/31/17, at 1. Caro also provided contact information for Lauthers and Hall. *See* N.T. (Trial, Amended), 5/9/18, at 28. Trooper Brough spoke with both Lauthers and Hall on the phone within the following days, and

eventually received written statements from both of them.[10] ***See id.*** at 29. It is not clear from the record exactly what information Lauthers and Hall provided to Trooper Brough, in either their phone conversations or written statements, concerning the results of the blood test. However, based on Trooper Brough's decision to apply for a search warrant, it is apparent that even if neither Lauthers nor Hall provided Trooper Brough with the precise BAC measured, one or both of them at least alluded to the fact that the result was positive. We conclude that **any** reference to, or comment on, the results of Shoemaker's blood alcohol test (which was improperly obtained under the Agreement), without her consent, violated Shoemaker's right to confidentiality under applicable DOT regulations. ***See*** 49 C.F.R. § 40.321.

Moreover, keeping ***Garrity*** in mind, the evidence supports Shoemaker's assertion that she did not voluntarily consent to the blood test. "[A] trial court must consider the totality of the circumstances when determining if a defendant's consent to a blood draw was voluntary." ***Commonwealth v. Miller***, 186 A.3d 448, 451 (Pa. Super. 2018).

> [T]he Commonwealth bears the burden of establishing that a consent is the product of an essentially free and unconstrained choice—not the result of duress or coercion, express or implied…. The standard for measuring the scope of a person's consent is based on an objective evaluation of what a reasonable person would have understood by the exchange….

---

[10] The written statements, which evidently served as the basis for obtaining the search warrant, **see** N.T. (Trial, Amended), 5/9/18, at 29, are not contained in the certified record.

*Commonwealth v. Kurtz*, 172 A.3d 1153, 1160 (Pa. Super. 2017) (citation omitted).

Here, Shoemaker's actions prior to and during the ride to FCMC indicated her unwillingness to submit to alcohol testing. ***See*** N.T. (Trial, Amended), 5/9/8, at 23-24 (wherein Hall testified that after informing Shoemaker that he had reason to believe she had been drinking, Shoemaker requested both vacation time and sick leave), 24 (wherein Hall testified that Shoemaker began talking during the ride to FCMC, and after he told Shoemaker that she would be tested for alcohol, she replied, "I'm going to be fucked."). When Lauthers and Hall spoke with Shoemaker on the Turnpike, Hall stated, "You will either go with [Lauthers] and I to the hospital to be tested[,] or I'm going to call the state police. They will pick you up and take you to the test. So it's however you want to do it." N.T. (Trial, Amended), 5/9/18, at 24. Lauthers and Hall then drove Shoemaker to FCMC for testing. ***See id.*** at 10. The laboratory technician informed Lauthers that she had attempted to complete the breath alcohol test three times, but that Shoemaker had failed to provide an adequate amount of breath for analysis. ***See id.*** at 11. At that point, Hall conferred with Caro, who instructed Lauthers and Hall to ask Shoemaker if she would submit to a blood test. ***See id.*** at 25, 34. According to Lauthers, Shoemaker agreed. ***See id.*** at 11-12, 18. Additionally, at the suppression hearing, Lauthers testified that he threatened Shoemaker that if she declined to take the blood test, it would be considered a refusal to submit. ***See*** N.T. (Suppression), 6/27/17, at 18.

- 16 -

Shoemaker did not have a choice to refuse alcohol testing, where her supervisors informed her that she could either come with them, or they would call the police. Additionally, after failing to adequately perform the breath test, Lauthers apprised Shoemaker that if she did not submit to a blood test, her actions would be considered a refusal under the Agreement. As a unionized employee subject to the Agreement, Shoemaker was reasonably on notice that a refusal would result in her discharge from employment. Thus, Shoemaker's only "choice" was whether to submit to a blood alcohol test, or to refuse the test and subject herself to discharge. Because a reasonable person would not feel free to deny consent under the threat of losing his or her job, or the involvement of law enforcement, we conclude that Shoemaker's consent to submit to a blood alcohol test was obtained through coercion, and not voluntarily given. *See Kurtz*, *supra*; *see also Commonwealth v. Kelly*, 369 A.2d 438, 443 (Pa. Super. 1976) (stating that "statements made under threat of being discharged are the products of coercion and are therefore inadmissible at trial."); *Garrity*, 385 U.S. at 497-98 (concluding that a choice between self-incrimination and losing one's livelihood "is likely to exert such pressure upon an individual as to disable him from making a free and rational choice[,]" and concluding that statements made when presented with such a choice are "infected by [] coercion … and cannot be sustained as voluntary…."). Accordingly, the suppression court erred by failing to suppress

the results of Shoemaker's blood alcohol test.[11]  Without the results of the

blood test to substantiate Shoemaker's BAC, there is insufficient evidence to

sustain Shoemaker's conviction for DUI – highest rate of alcohol.  ***See*** 75

Pa.C.S.A. § 3802(c).  Accordingly, we vacate Shoemaker's judgment of

sentence for DUI – highest rate of alcohol.[12]

Shoemaker's remaining claims challenge the sufficiency of the evidence

presented at trial.  When reviewing such challenges, we must ascertain

> whether, viewing all the evidence admitted at trial in the light
> most favorable to the verdict winner, there is sufficient evidence
> to enable the fact-finder to find every element of the crime beyond
> a reasonable doubt.  In applying the above test, we may not weigh
> the evidence and substitute our prior judgment for the fact-finder.
> In addition, we note that the facts and circumstances established
> by the Commonwealth need not preclude every possibility of
> innocence.  Any doubts regarding a defendant's guilt may be
> resolved by the fact-finder unless the evidence is so weak and
> inconclusive that as a matter of law no probability of fact may be
> drawn from the combined circumstances.  The Commonwealth
> may sustain its burden of proving every element of the crime
> beyond a reasonable doubt by means of wholly circumstantial
> evidence.  Moreover, in applying the above test, the entire record
> must be evaluated and all evidence actually received must be

---

[11] We additionally note that Shoemaker's blood test was not conducted following a motor vehicle accident involving injury, or for independent medical purposes.  ***See*** 75 Pa.C.S.A. § 3755 (authorizing a warrantless chemical test if a motorist requires emergency room treatment following a motor vehicle accident, and the police officer has probable cause to believe the accident involved a violation of section 3802); ***Commonwealth v. Miller***, 996 A.2d 508, 513 (Pa. Super. 2010) (stating that "where a blood draw is conducted for medical purposes, and the results of the blood test are obtained after proper execution of a search warrant, the results of the blood draw are admissible in the prosecution of a DUI defendant.").

[12] Because it appears that Shoemaker has completely served her sentence, we need not remand for resentencing.

> considered. Finally, the finder of fact, while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Furness*, 153 A.3d 397, 401 (Pa. Super. 2016) (citation and brackets omitted).

In her second claim, Shoemaker asserts that, in the absence of blood test results, there was insufficient evidence to support her conviction of DUI – general impairment. Brief for Appellant at 26. Shoemaker does not dispute that she drove a Commission vehicle on the Pennsylvania Turnpike, but claims that there was "no evidence that she drove erratically or in an unsafe manner." *Id.* Shoemaker also points out that no field sobriety tests were conducted by law enforcement. *Id.* at 27.[13]

Section 3802(a)(1) of the Motor Vehicle Codes provides that "[a]n individual may not drive, operate or be in actual physical control of the movement of a vehicle after imbibing a sufficient amount of alcohol such that the individual is rendered incapable of safely driving, operating or being in actual physical control of the movement of the vehicle." 75 Pa.C.S.A. § 3802(a)(1). Section 3802(a)(1) is an "at the time of driving" offense, and the Commonwealth must prove that "the accused was driving, operating, or in actual physical control of the movement of a vehicle during the time when

---

[13] We note that Shoemaker failed to include citation and discussion of relevant case law in support of her claim. *See* Pa.R.A.P. 2119(f) (providing that the argument shall include "such discussion and citation of authorities as are deemed pertinent."). Nevertheless, we decline to deem this issue waived.

he or she was rendered incapable of safely doing so due to the consumption of alcohol." ***Commonwealth v. Segida***, 985 A.2d 871, 879 (Pa. 2009).

> The types of evidence that the Commonwealth may proffer in a subsection 3802(a)(1) prosecution include[,] but are not limited to, the following: the offender's actions and behavior, including manner of driving and ability to pass field sobriety tests; demeanor, including toward the investigating officer; physical appearance, particularly bloodshot eyes and other physical signs of intoxication; odor of alcohol[;] and slurred speech. Blood alcohol level may be added to this list, **although it is not necessary** and the two hour time limit for measuring blood alcohol level does not apply. … The weight to be assigned these various types of evidence presents a question for the fact-finder, who may rely on his or her experience, common sense, and/or expert testimony.

***Id.*** (emphasis added). "[N]on-expert testimony is admissible to prove intoxication where such testimony is based upon the witness'[s] observation of the defendant's acts and speech[,] and where the witness can opine as to whether the defendant was drunk." ***Commonwealth v. Salter***, 121 A.3d 987, 996 (Pa. Super. 2015) (citation omitted). Additionally, "[e]vidence of erratic driving is not a necessary precursor to a finding of guilt under the relevant statute." ***Commonwealth v. Mobley***, 14 A.3d 887, 890 (Pa. Super. 2011).

The trial court addressed this claim as follows:

> Here, notwithstanding [Shoemaker's BAC], … the Commonwealth provided evidence as to deficiencies in [Shoemaker's] ability to drive. Specifically, the Commonwealth provided evidence as to [Shoemaker's] "actions and behavior, … demeanor, … physical appearance, … odor of alcohol, and slurred speech." ***Segida***, 985 A.2d at 879.

At the bench trial, Lauthers testified that he was instructed by another employee to "take a look at" [Shoemaker]. Lauthers approached [Shoemaker] to discuss the daily tasks[,] and during this encounter[,] observed her staggering[,] and heard [Shoemaker] slurring her speech. [Shoemaker] also made a perplexing statement wherein she uttered "I know I'm not the best, but I will do my best for you[,]" and after being questioned regarding whether she consumed any alcohol, [Shoemaker] stated "this was what we are going to do, really?" Lauthers further testified that he smelled alcohol on [Shoemaker's] breath. In addition, both Lauthers and Hall testified that they observed [Shoemaker] ma[k]e a [U]-turn by driving in the opposite lane [of] traffic on the Turnpike[,] despite repeated instructions for [Shoemaker] to stop [] driving. Moreover, [Shoemaker] indirectly admitted that she was under the influence of alcohol; when informed that she was heading to FCMC for an alcohol screening, [Shoemaker] responded "I'm fucked." Given the related observations, the facts and circumstances, including [Shoemaker's] statements, the Commonwealth has demonstrated that [Shoemaker] was under the influence of alcohol to such a degree as to render [her] incapable of safe driving….

Trial Court Opinion, 7/10/18, at 10-11 (some citations omitted). We additionally note that Lauthers observed Shoemaker staggering and slurring her speech shortly before she drove a Commission vehicle on the Turnpike. *See generally* N.T. (Suppression), 6/27/17, at 6-8 (wherein Lauthers testified that he spoke with Shoemaker at approximately 3:15 p.m.; he then went to the office to talk to Hall; Hall called the human resources department and told him to "go get [Shoemaker]"; and when he returned to the wash bay, Shoemaker was gone). Upon review, we conclude that the evidence, viewed in the light most favorable to the Commonwealth as the verdict-winner, was sufficient to support Shoemaker's conviction under 75 Pa.C.S.A. § 3802(a)(1). Therefore, Shoemaker is not entitled to relief on this claim.

In her third claim, Shoemaker argues that there was insufficient evidence to support her conviction of careless driving. Brief for Appellant at 27. Shoemaker claims that although she made a U-turn on the Turnpike, her actions did not interfere with any other traffic. *Id.* Shoemaker asserts that "[i]n the absence of the blood results, there is no evidence [that] Shoemaker acted in willful or wanton conduct." *Id.*[14]

Section 3714 of the Motor Vehicle Code provides that "[a]ny person who drives a vehicle in careless disregard for the safety of persons or property is guilty of careless driving, a summary offense." 75 Pa.C.S.A. § 3714. "The *mens rea* requirement applicable to [Section] 3714, careless disregard, implies less than willful or wanton conduct but more than ordinary negligence or the mere absence of care under the circumstances." *Commonwealth v. Ford*, 141 A.3d 547, 556 (Pa. Super. 2016) (citation omitted).

Here, Lauthers and Hall saw Shoemaker make a U-turn, but did not otherwise witness Shoemaker driving the Commission's vehicle. At trial, Lauthers testified that when they approached Shoemaker, the vehicle was parked on the side of the road, and Shoemaker was talking to a customer. *See* N.T. (Trial, Amended), 5/9/18, at 8-9; *see also id.* at 22 (wherein Hall testified that Shoemaker was still in the vehicle while she was speaking to the customer). Lauthers testified that as he and Hall pulled up behind her, Shoemaker pulled away in the Commission vehicle. *See id.* a 9. Hall yelled

---

[14] Shoemaker's argument regarding her final claim is largely underdeveloped. *See* Pa.R.A.P. 2119(a).

- 22 -

at Shoemaker to stop the vehicle, and Shoemaker "just made a [U]-turn [] inside the interchange." *Id.* at 23; *see also* N.T. (Suppression), 6/27/17, at 21 (wherein Hall testified that Shoemaker "basically did a 360 and parked the truck back in the parking area[.]"). Lauthers also testified that when Shoemaker "looped around," "[t]here wasn't anything coming." N.T. (Trial, Amended), 5/9/18, at 9.

Lauthers and Hall did not observe Shoemaker driving on the Turnpike. The only driving Lauthers and Hall personally witnessed was Shoemaker pulling out of the parking area, making a U-turn, and returning to the parking area behind their vehicle. Upon review, we conclude that this sole observation by Lauthers and Hall, without more, is insufficient to sustain Shoemaker's conviction of careless driving. *See generally Commonwealth v. Podrasky*, 678 A.2d 450, 452-53 (Pa. Super. 1977) (concluding that there was insufficient evidence to support the appellant's conviction, for making a U-turn on a highway, under a prior version of the reckless driving statute (defining reckless driving as driving any vehicle upon a highway "carelessly disregarding the rights or safety to others, or in a manner so as to endanger any person or property") because "[n]o accident occurred, and no evidence was adduced that appellant's turn nearly caused an accident or that it even interfered with the normal flow of oncoming traffic."). We therefore vacate Shoemaker's judgment of sentence for careless driving.

Judgment of sentence affirmed in part, and vacated in part.

Judge Shogan joins the memorandum.

Judge Olson concurs in the result.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 05/16/2019